KAHN A. SCOLNICK, SBN 228686
  KScolnick@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA  90071-3197
Telephone:    213.229.7000
Facsimile:    213.229.7520

*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

| | |
|---|---|
| Optum Rx, Inc.; Emisar Pharma Services, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> Rob Bonta, *in his official capacity as Attorney General of the State of California*; Mary Watanabe, *in her official capacity as Director of the California Department of Managed Health Care*; Ricardo Lara, *in his official capacity as Insurance Commissioner of the State of California*, <br><br> Defendants. | CASE NO. <br><br><br> **COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** <br><br><br> Date Action Filed:  May 8, 2026 |

**INTRODUCTION**

1.      Governor Gavin Newsom has correctly called California Senate Bill 41 ("SB 41") "the most aggressive effort" by any state to regulate pharmacy benefit managers ("PBMs") that manage prescription drug benefits for health plans throughout the United States.  But in imposing sweeping regulations on PBMs, California is effectively regulating the PBMs' customers—health plans sponsored by employers—by limiting their options to control prescription drug costs.  In so doing, SB 41 violates established principles of federal preemption under the Employee Income and Retirement Security Act ("ERISA").

2.      This lawsuit challenges three aspects of SB 41 that improperly restrict the ability of health plans to provide affordable prescription drug benefits to their members.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

a. ***Formulary provisions***.  SB 41 drastically curtails the ability of PBMs and their plan customers to utilize one of the most common and effective ways to control drug costs: obtaining drug rebates from manufacturers in exchange for formulary exclusivity.  For years, PBMs have negotiated rebates with drug manufacturers as a way to reduce brand-name drug costs for their health plan customers, and in doing so their strongest negotiating leverage has come from offering exclusivity on drug formularies—leverage that SB 41 would eliminate.

b. ***Pharmacy network provisions***.  SB 41 restricts PBMs (and their plan customers) from preferring some pharmacies over others, which is another one of the most common ways to lower prices that patients pay for drug costs.  Plans may choose to provide greater coverage for pharmacies affiliated with their PBMs because those pharmacies in many instances offer safer, more reliable, and more cost-effective services.  But SB 41 prohibits PBMs from implementing plan terms that favor PBM-affiliated pharmacies, thus limiting plans' choices, requiring them to cover pharmacies that their sponsor may prefer to exclude, and undercutting plans' leverage in contracting with those pharmacies.

c. ***PBM compensation provisions.***  SB 41 overhauls how PBMs are compensated.  Before SB 41's passage, plans could use a variety of compensation mechanisms that aligned the PBMs' incentives with plan sponsors' goals of lowering prices.  SB 41 eliminates these options, requiring that PBM compensation be untethered from plan goals.

3. Health care plans can avoid these restrictions only by cutting PBMs out of the process and transferring PBMs' critical functions to insurers that often lack the experience, capacity, and leverage with drug manufacturers and pharmacies to perform that work as efficiently and effectively. SB 41 thus makes plans either abandon these tried-and-true methods of controlling drug costs or

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

Gibson, Dunn &
Crutcher LLP

sacrifice the leverage and efficiency they gain from working with a PBM.

4. By undercutting plans' ability to control drug costs, SB 41 is most obviously an economic win for drug manufacturers and pharmacies, not patients or their health plans. But regardless of who ultimately benefits from SB 41, what matters for purposes of ERISA preemption is that SB 41 improperly substitutes the judgment of California's government officials for health plan sponsors and fiduciaries.

5. Under ERISA and many long-established authorities applying it, state laws regulating ERISA-governed health plans—particularly the design of these plans—are expressly preempted. ERISA reflects a recognition by Congress that imposing a patchwork of state laws on health plans would be ruinously complex and costly, and that health plan sponsors—not state government officials—are in the best position to decide how best to design and manage benefits for their members. By imposing state-specific restrictions that undercut plans' choices, SB 41 is antithetical to ERISA's key goal of preserving national uniformity.

6. This Court should enter a declaratory judgment that SB 41's formulary, pharmacy network, and compensation provisions are preempted by ERISA and an injunction prohibiting Defendants from enforcing that provision in the context of ERISA plans.

## PARTIES

7. Plaintiff Optum Rx, Inc. ("Optum Rx") is incorporated in California and has its principal place of business in Eden Prairie, Minnesota. Optum Rx acts as a PBM and manages prescription drug benefits for numerous employer health plans throughout the United States, including thousands in the State of California.

8. Plaintiff Emisar Pharma Services, LLC ("Emisar") is a Delaware limited liability company. Emisar acts as a group purchasing organization ("GPO"). GPOs negotiate with drug manufacturers on behalf of PBMs, utilizing the high number of "covered lives" in exchange for price

concessions.

9.    Defendants are California officials who are responsible for administering or enforcing SB 41, including: (1) Article 6.1 of Chapter 2.2 of Division 2 of the California Health & Safety Code ("Article 6.1"), where SB 41's provisions governing formulary design, pharmacy network, and PBM reimbursements are codified, *see* Health & Safety Code §§ 1385.001, .0026-.0029, .0031; and (2) the California Insurance Code, where several other provisions of SB 41 are codified, *see* Ins. Code § 10123.2045.  All Defendants are sued solely in their official capacities.

10.    Defendant Rob Bonta is sued in his official capacity as the Attorney General of California.  As Attorney General, he has general authority to seek injunctions on behalf "of the people of the State of California" for "any unlawful … business act or practice," Bus. & Prof. Code §§ 17200, 17204, including any practice that violates Article 6.1 or the California Insurance Code.  SB 41 also specifically authorizes the Attorney General to "asses[s] and recove[r]" civil penalties for violations of Article 6.1, *see* Health & Saf. Code § 1385.0033(a), and to seek "specific performance, injunctive relief, and other equitable remedies a court deems appropriate for enforcement" of Article 6.1, *id.* § 1385.0033(b).

11.    Defendant Mary Watanabe is sued in her official capacity as the Director of the California Department of Managed Health Care ("DMHC").  The DMHC has "authority to enforce the provisions of" Article 6.1.  Health & Saf. Code §§ 1385.002(a), .001.

12.    Defendant Ricardo Lara is sued in his official capacity as the Insurance Commissioner of California and head of the California Department of Insurance ("DOI").  The DOI is responsible for enforcing the California Insurance Code, Ins. Code § 12921(a), including through authority to promulgate rules and regulations, and bring administrative enforcement actions, *id.* §§ 12921(b), 10125.2(e).  The DOI therefore is authorized to enforce the provisions of SB 41 that are codified in the Insurance Code.  This includes the provisions of SB 41 that prohibit spread pricing in contracts between

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

Gibson, Dunn &
Crutcher LLP

PBMs and health insurers.  *Id.* § 10123.2045(c).  It also includes California Insurance Code § 10125.2(a), which in turn provides that PBMs that contract with health insurers must comply with Article 6.1, *id.* § 10125.2(a).  As a result, in enforcing Section 10125.2(a), the DOI has the authority to enforce Article 6.1 against PBMs in their contracts with California-licensed insurers.

13.    Separately, Commissioner Lara has authority to "receive complaints and inquiries, investigate complaints, [and] prosecute insurers," Ins. Code § 12921.3(a), and "when warranted, to bring enforcement actions against insurers," *id.* § 12921.1(a).  SB 41, in turn, provides that "[a] complaint made by an insured that includes potential violations by a pharmacy benefit manager of the terms of Article 6.1 … may be considered by the department to be a complaint against the health insurer." *Id.* § 10125.2(b); Health & Saf. Code § 1385.0023(c).

### JURISDICTION AND VENUE

14.    This action arises under the Supremacy Clause, U.S. Const. art. VI, cl. 2; 42 U.S.C. § 1983; the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132 *et seq.*; the Court's inherent equitable powers; and the Declaratory Judgment Act, 28 U.S.C. § 2201.  Accordingly, this Court has federal-question subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

15.    Venue in this District is proper because all Defendants are sued in their official capacities and execute their official duties in the Eastern District of California, so they therefore are deemed to reside in the Eastern District of California.  *See* 28 U.S.C. § 1391(b)(1).  Defendant Bonta executes his official duties at 1300 I Street, Sacramento, CA 95814.  Defendant Watanabe executes her official duties at 980 9th Street, Suite 500, Sacramento, CA 95814.  Defendant Lara executes his official duties at 300 Capitol Mall, 17th Floor, Sacramento, CA 95814.  Venue additionally is proper in this District because a substantial part of the events giving rise to this suit, including the enactment of SB 41, occurred in this District.  *See* 28 U.S.C. § 1391(b)(2).

Gibson, Dunn &
Crutcher LLP

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

## FACTUAL BACKGROUND

### I.    ERISA Governs Health Plans Sponsored By Employers

16.    Most California residents, like most Americans, rely on employer-sponsored health plans to help cover the cost of prescription drugs.  Federal law generally leaves the design of these plans to the employers that sponsor them, ensuring that plan sponsors can design the health plans, including prescription drug plans, that best suit the particular needs of their employees.

17.    ERISA is the federal law that regulates the administration of employee benefit plans, including prescription drug benefit plans and other health plans.  *See* 29 U.S.C. § 1002(1)-(3).  Except for plans offered by governmental entities and churches, all employer-sponsored plans are governed by ERISA.  29 U.S.C. § 1003(a)-(b).

18.    Congress enacted ERISA in 1974 after "almost a decade of studying the Nation's private pension plans."  *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361 (1980).  ERISA was designed "to ensure that plans and plan sponsors would be subject to a uniform body of benefits law," *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86 (2020) (quotation marks omitted), and to "alleviate" burdens on employers that "discourage the maintenance and growth of … pension plans." 29 U.S.C. § 1001a(c)(2).

19.    "Nothing in ERISA requires employers to establish employee benefits plans." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996).  Rather than mandate particular benefits, ERISA is designed to set uniform national standards for plan administration—and thus to ensure that employers operating in multiple states can implement their plans nationwide without "interference from laws of the several States."  *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 326 (2016).

20.    ERISA plans can be self-funded or fully insured.  For self-funded plans, the employer that sponsors the plan bears the financial risk of paying prescription drug claims (*i.e.*, the cost of the drugs obtained by the plan sponsor's members).  By contrast, in a fully insured plan, a third-party insurance company takes on the financial risk of paying for prescription claims in exchange for

6

Gibson, Dunn & Crutcher LLP

premiums paid to it by the members.

21.     Despite these differences in the funding mechanism, under ERISA there are many similarities between self-funded and fully insured plans.  In both cases health benefits are designed and administered under ERISA.  In both cases the plan sponsor is the ultimate entity that has the final say as to key aspects of plan design, such as covered services, cost-sharing, and eligibility.  In both cases claims are processed pursuant to ERISA benefit determination rules, and any provider disputes are processed through internal appeals and judicial review standards set out by ERISA.  In both cases there is federal ERISA oversight of benefits determination.  In other words, for members and patients, the funding mechanism (whether a plan is fully insured or self-funded), does not change anything about the benefits offered or the protections governing plan administration.  Covered services, cost-sharing obligations, access to care, procedural protections, and available remedies are determined by the same ERISA-governed benefit design, regardless of whether benefits are funded by an employer or an insurer.

22.     This suit concerns SB 41's regulation of fully insured plans—an area of special concern given that fully insured plans are used by many of California's small employers, which have limited ability to absorb prescription-drug price increases.

## II.     Plan Sponsors' Decisions In Managing Their Prescription Drug Benefits

23.     In designing a health plan, including a prescription drug plan, employers face a range of choices that determine the benefits they can offer and on what terms.  In making those decisions, plan sponsors consider the needs of their members and balance the breadth of benefits they can offer against the cost to both the plan sponsor and the member to provide those benefits.  Because prescription drug benefits make up about 22% of members' total healthcare costs, *see* UnitedHealth Group, *Less than 6% of Commercial Health Premiums Goes to Administration* (Dec. 2025), bit.ly/4bjxnrj; Dan Bell et al., *2025 Milliman Medical Index*, at p. 6 (May 2025), bit.ly/3NjAaZB, these

Gibson, Dunn & Crutcher LLP

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

decisions have a significant impact on the cost of providing health coverage and the scope of the benefits that employers can offer.

24.    ***Formulary Decisions***.  At a very basic level, plan sponsors must decide which benefits to offer.  In the prescription drug context, that includes deciding "what drugs the plan covers (the formulary), how much the plan will pay for those drugs (the cost-sharing terms), and at which pharmacies beneficiaries can have prescriptions filled (the pharmacy network)." *Pharm. Care Mgm't Ass'n v. Mulready*, 78 F.4th 1183, 1188 (10th Cir. 2023).

25.    Formularies are tiered lists of drugs that are covered under a health plan.  When multiple therapeutically equivalent drugs are available to treat the same condition, plans have various options.  They can choose to cover all of those drugs or limit coverage to the less expensive options, thus saving the plan and its members money without compromising care.  Or they can choose to include more expensive drugs on a higher formulary tier so that those drugs are covered only subject to utilization management rules or higher cost-sharing by the member.  And plans have various ways to combine and balance these methods and considerations, taking into account their member populations, funding, and plan priorities.  Generally, the more restrictions in a formulary, the lower the costs for the plan and members, and the fewer restrictions in a formulary, the more expensive the costs for the plan and members.

26.    ***Decisions Regarding Pharmacy Networks***.  Plan sponsors also make decisions about which pharmacies to cover and under what terms.  To control costs and ensure reliable, high-quality services, plans contract with a network of pharmacies that agree to provide prescription drugs to plan members at specific, often discounted prices.  To encourage plan members to choose less-expensive in-network or preferred pharmacies, the terms of a prescription drug plan may exclude coverage for out-of-network pharmacies or may offer financial incentives such as smaller cost-sharing when members purchase drugs at in-network pharmacies.  Plan sponsors thus make many choices involving

8

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

Gibson, Dunn &
Crutcher LLP

a tradeoff between choice and affordability:  Broader networks give members more options, but narrower networks help control costs.

27.  ***Deciding Who Will Manage Prescription Drug Benefits, And How To Compensate Them***.  Plan sponsors must also determine who will administer the plan.  Fully insured plans, for example, are typically administered by their insurers.  But given the complexities of the prescription drug market—and management of prescription drug benefits—most health plans also rely on PBMs to manage their pharmacy benefits.  Alternatively, some California insurers, like Blue Shield of California, "retai[n] [their own] pharmacy decision-making capabilities" and do not contract with a separate PBM.  Blue California, *Frequently Asked Questions: Pharmacy Care Reimagined* (August 2024), https://tinyurl.com/4bff2s73.  Ultimately, it is up to plan sponsors—including through their choice of third-party administrator or insurer—to determine what role, if any, a PBM will play in managing their prescription drug benefit plans.

28.  In connection with the decision about who will manage prescription drug benefits, plan sponsors must also decide how to compensate these entities, including PBMs.  PBMs offer a variety of compensation models that plans can choose based on their objectives.  Different plan sponsors may prefer different combinations of mechanisms depending on their willingness to bear risks or their cash flow priorities.  These compensation models are described in greater depth *infra* in §§ 46-54.

## III.  PBMs' Role In Managing Prescription Drug Benefits And Controlling Drug Costs

29.  Although plan sponsors are the ultimate decisionmakers when it comes to making the above decisions, PBMs often play a role in performing many of these services, and they do so in ways that SB 41 seeks to limit or eliminate—thereby restricting the choices available to health plans to manage their prescription drug benefits.

### A.  PBMs Negotiate Drug Price Concessions And Facilitate Formulary Design

30.  One of PBMs' most important functions is to negotiate price concessions from drug manufacturers.  PBMs like Optum Rx—as well as GPOs like Emisar—act as counterweights to the

9

Gibson, Dunn &
Crutcher LLP

substantial market and pricing power of drug manufacturers, helping to drive down the net cost of prescription drug benefits for plan sponsors and their members.

31.    Manufacturers set the list prices for their drugs unilaterally, often in excess of fair market value, particularly for breakthrough medicines with few or no clinically equivalent alternatives. Since ERISA does not dictate plan coverage, plan sponsors are free to exclude from their formularies expensive drugs that are not clinically necessary for their members.  Or they can try to negotiate price concessions in exchange for formulary placement.  But individual plans may lack the bargaining power to negotiate effectively with manufacturers.

32.    PBMs and GPOs address this power imbalance by negotiating collectively on behalf of a broad number of plans.  A 2022 study published by the National Bureau of Economic Research found that PBMs' negotiations with manufacturers saved the healthcare system $145 billion each year by reducing the cost of drugs.  Casey B. Mulligan, *The Value of Pharmacy Benefit Management*, at p. 2, Nat'l Bureau of Econ. Rsch. (July 2022), https://bit.ly/4rReoec ("Mulligan Report").

33.    Manufacturer price concessions typically take the form of rebates.  Manufacturers typically pay rebates to PBMs, and the PBMs pass the savings on to the customers and plans they service in accordance with the terms of their contracts with those plans.  Plan sponsors, in turn, can pass those rebates through to their members in the form of reduced prices at the pharmacy counter, reduced premiums, or richer benefits offered to their members.

34.    The price concessions that PBMs negotiate form the backbone of most plans' decisions about formulary design because PBMs can use formulary placement to negotiate discounts on clinically similar drugs, as discussed above.  Many manufacturers' contracts with PBMs specify the level of rebate that a manufacturer will offer for a given drug depending on the placement of that drug on the plan sponsor's formulary and the degree of exclusivity of that placement.  Plan sponsors that use a particular PBM can access these negotiated rebates—and cost savings—when they opt to use the

Gibson, Dunn &
Crutcher LLP

10
COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

formulary placement specified in the PBM's contract with the manufacturer.

35.    PBMs also provide plan sponsors with options for designing their formularies.  For example, PBMs develop multiple "template" formularies of covered drugs across many therapeutic categories to help plans ensure their formularies are comprehensive enough to offer clinically appropriate drugs to members.  Plan sponsors can choose from the template formulary options developed by PBMs, work with the PBM to customize the template formulary to meet their needs, or create their own formularies entirely.

36.    In performing these services for thousands of health plans throughout the United States, PBMs empower many plan sponsors to design formularies more efficiently and effectively than if individual plan sponsors each had to design their own formularies from scratch.

37.    But ultimately, the decision as to which formulary to adopt is left entirely to the plan sponsor's discretion.  Each plan sponsor retains the authority to design and administer its own plan, including the contents of its formulary, and no formulary becomes part of a plan sponsor client's offered benefit design unless and until the plan sponsor adopts it.  The result is that Optum Rx facilitates more than 30,000 unique formularies per year for its thousands of clients, each of which reflects diverse choices that those diverse clients made about the formulary designs that render their plans most attractive to their members.

**B.    PBMs Set Up And Manage Pharmacy Networks For Plans**

38.    PBMs also play a role by setting up and managing pharmacy networks that can be incorporated into plan sponsors' plan designs.  PBMs contract with thousands of pharmacies (and their contracting agents) to obtain favorable reimbursement terms for plans that choose to cover those pharmacies' services.  Pharmacies may also agree to even more favorable terms for plans that give them more favorable treatment, such as lowering copayments for drugs purchased at those pharmacies to drive more business to those pharmacies.

Gibson, Dunn &
Crutcher LLP

11

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

39.    PBMs can negotiate these pharmacy network contracts more efficiently than some individual plan sponsors for the same reason PBMs are able to negotiate lower drug prices for some plan sponsors. By negotiating on behalf of many different plans, PBMs have greater ability to drive business towards contracting pharmacies, and can thus obtain better deals for their clients.

40.    Some PBMs also have affiliated pharmacies that can offer safe, reliable, and cost-effective services to health plans and their members. For example, Optum Rx provides numerous services designed to efficiently deliver safe and effective medications.

41.    ***Optum Home Delivery***.  Optum Rx primarily provides mail-order pharmacy services through Optum Home Delivery. Optum Home Delivery delivers medications directly to patients' doors—orders typically are shipped within two days—which makes the process of filling prescriptions significantly more convenient for patients. Patients in rural communities, and with transportation barriers and mobility challenges, often have no practical alternative to home delivery. Regulations that discourage or impede the use of these important services naturally create the risk of missed doses, treatment interruptions, and poorer health outcomes. Optum Home Delivery also uses extensive safety and quality-control measures to ensure accurate and prompt delivery of prescriptions, including multiple safety checks.

42.    ***Optum Specialty Pharmacy***.  Optum Specialty Pharmacy is a mail-order service that helps fill prescriptions for "high touch" drugs that require significant patient management, education, and monitoring, often require specialized handling, typically treat rare and chronic conditions (such as hemophilia, certain cancers, inflammatory diseases, and neurological conditions), and can be extraordinarily expensive. Optum Specialty Pharmacy thus proactively converts patient prescriptions to lower-cost generics, resulting in substantial cost savings to plans and patients. Optum's specialty pharmacists and care-management team members are also specially trained to serve patients with complex and rare diseases.

Gibson, Dunn &
Crutcher LLP

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

43.   ***Optum Frontier Therapies***.  Optum Frontier Therapies provides access to even rarer drugs—so-called "ultra-limited drugs"—through Optum Frontier Therapies, which operates specialty mail-order pharmacies.  Patients with complex or rare conditions receiving limited distribution specialty drugs (such as ultra-cold chain cell and gene therapies) would have no immediate alternative to access their medications, as independent pharmacies in their area often do not stock these expensive, rare medications.  In addition to Optum Frontier Therapies' convenient mail-order option, it provides 24/7 support to pharmacists specially trained in supporting complex therapies and addressing rare diseases.

44.   ***Optum Infusion Pharmacy***.  Optum Infusion Pharmacy similarly facilitates convenient infusion care at home or in ambulatory suites for patients whose diseases (including Crohn's disease, rheumatoid arthritis, bleeding disorders, or multiple sclerosis) require this specialized treatment.

45.   Many plan sponsors have elected to include these services in their networks as another way to provide prescription quality drug benefits to their members at an affordable cost.

46.   Just like with formularies, PBMs also provide plan sponsors with many different pharmacy network options that can be used in plan design.  For example, PBMs design multiple "template" pharmacy networks—as well as customized networks—including different combinations of affiliated, nonaffiliated, mail-order, and specialty pharmacy options to help plan sponsors ensure their pharmacy networks are comprehensive enough to support the needs of the plan's members.  Based on PBMs' deep knowledge and experience managing these networks, they can handle these tasks more efficiently and effectively than some individual plan sponsors, especially if each had to design its own pharmacy network from scratch.

47.   It is ultimately up to plan sponsors, in turn, whether to use PBMs for pharmacy network management at all, and if so, which pharmacy network to use in their plan benefits from this array of options provided by PBMs, all based on the plan's assessment of which option or options work best

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

Gibson, Dunn &
Crutcher LLP

for its members.

C.      **Plan Sponsors Choose Whether To Use A PBM And How to Compensate The PBM For Its Services**

48.     Plan sponsors are not required to use PBMs.  But many choose to do so—or choose insurers that do so—based on the value PBMs bring to prescription drug benefits, as discussed above.

49.     In deciding whether and how to use a PBM, health plans (and the insurers that administer them) also decide how to compensate PBMs.  These options include the following.

50.     Many PBMs are compensated based on a method referred to as "spread pricing." Through this model, the plan sponsor (or its insurer/administrator) compensates the PBM based on claims experience—*i.e.*, by paying the PBM a higher amount for claims than the PBM pays to the pharmacy on those claims, and allowing the PBM to keep this "spread" as compensation.  Spread pricing allows the plan (or its insurer/administrator) to pay for a PBM's services based on actual claims experience, which may help manage cash flow and offer other efficiencies.

51.     Another option is to use "pass-through" pricing, through which the PBM passes through to its client the reimbursement rate it pays to the pharmacy, without any "spread."

52.     Plans that use pass-through pricing need to compensate PBMs in ways other than spread for their services.  This compensation can take various forms, such as a fixed, administrative, "per-member, per-month fee," or "per-claim fee" for every claim the PBM processes.  The fixed, per-member model provides predictability, but if members do not utilize benefits, then the plan sponsor or insurer/administrator may end up paying for services that are not used.  The per-claim fee model likewise provides certainty as to cost, because how much the PBM is paid for each claim does not change with fluctuations in drug price, but higher utilization than predicted may result in unexpected higher costs.

53.     Some plans (or insurer/administrators) also negotiate guarantees with PBMs for particular categories of prescription drugs, through which the PBM is required to manage prescription

Gibson, Dunn &
Crutcher LLP

14

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

drug costs to a negotiated guaranteed rate. These guarantees give the plan greater certainty as to what it will pay for a particular type of prescription rather than potentially paying a variety of rates over time depending on which pharmacy a member uses and as manufacturers raise prices. In doing so, such guarantees shift the risk of a manufacturer price increase from a plan to its PBM.

54. Another way that plans (and their insurers/administrators) can choose to compensate a PBM is by allowing it to retain a portion of any rebates or other fees obtained from drug manufacturers. Optum Rx's clients typically elect not to use this method of compensation—indeed, Optum Rx currently passes on the vast majority of rebates to its clients. But the decision as to how to use rebate dollars—whether to treat them as compensation to the PBM or to pass them through and compensate the PBM in a different way—ultimately belongs to the plan sponsor.

55. These are just a few of the many options plans have in considering whether to contract with a PBM and how to compensate the PBM for its services. The availability of these different options—and the ability to choose among them based on the plan's goals and priorities—is a critical part of plan design.

56. PBM contracts with their clients (plan sponsors, or their insurers/administrators) typically last between one and five years, and then the client may put its business out for competitive bids. Many PBM clients also negotiate "market check" provisions in their PBM contracts at specified intervals to ensure that they benefit from better terms offered by their current PBM and/or competing PBMs during the term of the contract. PBMs' clients are free to switch PBMs—or negotiate different terms—if they are not satisfied with their PBM's performance or if they receive a better offer from another PBM for one or more services.

## IV. California Enacts SB 41—A "Sweeping Reform Of The Allowable Business Practices" Of PBMs

57. Against this backdrop, Governor Newsom signed SB 41 into law on October 11, 2025. SB 41 radically restricts the options of ERISA plans in relation to the PBM services discussed above.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

Gibson, Dunn & Crutcher LLP

The law is a "sweeping reform of the allowable business practices" of "PBMs" and "represents the most aggressive effort" in the country to regulate PBMs.  Governor Newsom Press Release, *Governor Newsom Signs SB 41 to Lower the Cost of Prescription Drugs* (October 11, 2025), https://bit.ly/4czXgFm.

58.    SB 41 specifically targets—and seeks to eliminate—the choices that many plans currently make to manage prescription drug benefits.  And it eliminates or limits these choices for a specific category of health plan (fully insured plans) used by many of California's small employers— which arguably have the greatest need to manage prescription drug costs because of their limited ability to absorb significant increases in prescription drug costs.

59.    Most of the provisions of SB 41 that are relevant to ERISA plans are focused on fully insured plans.  And most of those provisions, in turn, are codified in Article 6.1 of Chapter 2.2 of Division 2 of the California Health & Safety Code.  For purposes of that Article, SB 41 defines PBM broadly to include not only traditional PBMs, but also GPOs like Emisar.[1]  But that definition excludes PBMs in their services for self-funded ERISA plans.[2]  As a result, the only ERISA plans affected by

---

[1]  *See* Health & Saf. Code § 1385.001(t)(1) (defining "pharmacy benefit manager" broadly to include any "person, business, or other entity that, either directly or through an intermediary, affiliate, or both, acts as a price negotiator or group purchaser on behalf of a payer, or manages the prescription drug coverage provided by the payer, including, but not limited to, the processing and payment of claims for prescription drugs, the performance of drug utilization review, the processing of drug prior authorization requests, the adjudication of appeals or grievances related to prescription drug coverage, contracting with network pharmacies, or controlling the cost of covered prescription drugs").

[2]  Specifically, an entity qualifies as a PBM for purposes of Article 6.1 only when it provides applicable services to a "payer."  Health & Saf. Code § 1385.001(t)(1).  And a "payer" is either:  (1) "a health care service plan licensed by" the California DMHC; or (2) "a health insurer licensed by the [California] Department of Insurance," *id.* § 1385.001(m).  Self-funded ERISA plans are not "health care service plan[s] licensed by" the DMHC, *id.*, because the provisions requiring health care services plans to obtain a license, *id.* §§ 1340-1345.5, have been held to be preempted by ERISA, *Hewlett-Packard Co. v. Barnes*, 571 F.2d 502, 504 (9th Cir. 1978); *Drummond v. McDonald Corp.*, 167 Cal. App. 3d 428, 432 (1985).  The result is that no self-funded ERISA plan is currently licensed by DMHC.  Nor do self-funded plans qualify as "health insurer[s] licensed by the Department of Insurance," Health & Saf. Code § 1385.001(m).  Indeed, ERISA prohibits States from "deem[ing]" any self-funded plan "to be an insurance company."  29 U.S.C. § 1144(b)(2)(B).  As a result, for purposes of Article 6.1, self-funded ERISA plans are not "payers," and entities providing services to them do not qualify on that basis as "pharmacy benefit managers."

Gibson, Dunn & Crutcher LLP

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

the provisions challenged here are fully insured plans.

60.    In addition to excluding services provided to self-funded ERISA plans, SB 41 also exempts insurers like Blue Shield of California that perform their own pharmacy benefit management services in-house without the aid of a separate legal entity.[3]  Many insurers do not currently provide these services in-house; nor do they have the ability to perform them effectively or efficiently in-house, particularly on the short turnaround imposed by SB 41.  Employers that offer insured ERISA plans thus face a choice: submit to SB 41's restrictions on plan design or stop working with a PBM—and thus sacrifice the leverage and efficiency that a PBM can offer.

61.    SB 41 subjects entities that meet Article 6.1's definition of a pharmacy benefit manager to a host of restrictions that effectively limit the choices fully insured plans can make to manage prescription drug benefits.  Plaintiffs here seek relief as to SB 41's restriction on formulary design, pharmacy network design, and PBM compensation so that plan sponsors can design their benefits in ways that align with their goals and can use the PBM of their choice.

**A.    SB 41 Restricts Plans' Choice In Designing Formularies**

62.    SB 41 limits plans' ability—with the aid of their PBMs—to use one of the best-established and most effective ways to control drug costs in negotiations with drug manufacturers: formulary exclusivity.  Health & Safety Code § 1385.0032(a) states that a pharmacy benefit manager shall not enter into contracts with manufacturers "that implement implicit or express exclusivity for those manufacturers' drugs, unless the pharmacy benefit manager can demonstrate the extent to which exclusivity results in the lowest cost to the payer, and the lowest cost sharing for the plan participant."  As explained above, some drug manufacturers will offer discounts to their list price in exchange for exclusive placement on a formulary tier to drive volume.  Under SB 41, however, when a plan relies

---

[3]  Specifically, Article 6.1's definition of "pharmacy benefit manager" exempts any "health insurer licensed to provide health insurance" in California.  Health & Saf. Code § 1385.001(t)(3)(D).  Because a licensed health insurer itself is not a PBM, no PBM is involved if the insurer provides its own PBM services without the aid of a separate entity.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

Gibson, Dunn & Crutcher LLP

on a PBM to negotiate price concessions with manufacturers, the plan cannot agree to limit coverage to a single, exclusive manufacturer's drugs in order to access price concessions from that manufacturer unless the requirements of Section 1385.0032(a) are met.

63.     Section 1385.0032(a) permits exclusivity only where the PBM can demonstrate the extent to which exclusivity lowers costs for the plan participant.  This limits plan sponsors' options in two ways.  First, plan sponsors often make formulary design decisions in the aggregate.  Even where exclusivity increases the price of a particular drug to individual plan participants, the refunds received in exchange for exclusivity may be used by the plan to expand coverage, lower premiums, or reduce cost-sharing to plan participants in the aggregate.  But SB 41 appears to require employers to disregard these aggregate benefits in favor of considering the effect of exclusivity on each individual plan participant.  Second, plan sponsors lose the option of keeping the savings for themselves to reduce the cost of offering a health plan.  By requiring plans to expand coverage and cover more than one drug in a particular category where they cannot show the extent to which exclusivity lowers their *members*' costs, SB 41 overrides employers' decisions about the extent of coverage to provide.  Because ERISA does not require employers to offer prescription drug coverage, much less coverage of any particular drug or group of drugs, forcing employers to expand coverage interferes with core plan design decisions that ERISA leaves to the plan sponsor.

64.     Plans can avoid these restrictions on their formularies only by cutting PBMs out of the process—for example, by purchasing insurance through an insurer like Blue Shield of California that performs its own PBM functions in-house.  SB 41 thus forces plan sponsors to choose between two core aspects of plan design: the scope of coverage and the decision about who will administer the plan.

**B.     SB 41 Restricts Plans' Choices In Designing Pharmacy Networks**

65.     SB 41 also amends the Health & Safety Code to set out new restrictions on how PBMs contract with and compensate pharmacies in their networks.  While this provision operates ostensibly

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

Gibson, Dunn &
Crutcher LLP

on PBMs, the effect is to limit plan sponsors' options regarding which pharmacies to cover and on what terms, altering the substantive scope of coverage for any plan that relies on PBMs to negotiate with pharmacies.

66.    Several provisions of SB 41 eliminate or restrict the ability of PBMs to negotiate favorable terms with pharmacies on behalf of their insured plan clients.  Health & Safety Code § 1385.0026(a) prohibits discrimination against nonaffiliated pharmacies, effectively requiring PBM clients to cover purchases of prescription drugs from all pharmacies in their networks on the same terms that they cover pharmacies that are affiliated with the PBM.  An "affiliated pharmacy" is one that is under the same corporate structure as the PBM.  Health & Saf. Code § 1385.001(b).  For example, Optum Home Delivery and many Optum-owned specialty pharmacies would be considered affiliates of Optum Rx and Emisar.

67.    For nonaffiliated pharmacies, Health & Safety Code § 1385.0026(a) imposes a blanket prohibition on "any requirements, conditions, or exclusions that discriminate against a nonaffiliated pharmacy in connection with dispensing drugs."  PBMs may not, for example: (1) impose "[t]erms or conditions" in contracts with nonaffiliated pharmacies "based on their status as a nonaffiliated pharmacy," *id*. § 1385.0026(b)(1); (2) "[r]efus[e] to contract with or terminat[e] a contract with a nonaffiliated pharmacy" based on their status as a nonaffiliated pharmacy, *id*. § 1385.0026(b)(2); and (3) reimburse a nonaffiliated pharmacy less for a pharmacist service than the PBM would reimburse an affiliated pharmacy for the same service, *id*. § 1385.0026(b)(5).

68.    For plans that rely on PBMs to negotiate contracts with pharmacies in their network, the effect of these "non-discrimination" provisions is to limit plan design.  A plan sponsor that wants to offer coverage of pharmacies affiliated with its PBM on more favorable terms than other pharmacies can no longer do so.  The plan cannot condition coverage of a nonaffiliated pharmacy on that pharmacy's agreement to certain terms or conditions; it cannot exclude a nonaffiliated pharmacy if the

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

Gibson, Dunn &
Crutcher LLP

plan prefers to cover only affiliated pharmacies; and it cannot agree to reimburse affiliated pharmacies at more favorable rates than nonaffiliated pharmacies.

69.    In another limitation impacting pharmacy networks used by insured ERISA plans, Health & Safety Code § 1385.0027 severely restricts PBMs from administering plan terms that favor affiliated pharmacies over nonaffiliates.  For example, a PBM may not: (1) "[r]equire a plan participant to use only an affiliated pharmacy," *id.* § 1385.0027(a); (2) "[f]inancially induce a plan participant to transfer a prescription only to an affiliated pharmacy," *id.* § 1385.0027(b); (3) "[u]nreasonably restrict a plan participant from using a particular contracted pharmacy" for covered services, *id.* § 1385.0027(d); or (4) "[d]eny … preferred participation status" to a "nonaffiliated contract pharmacy … if the pharmacy is willing to accept the same terms and conditions that the pharmacy benefit manager has established for affiliated pharmacies as a condition of preferred network participation status," *id.* § 1385.0027(f).

70.    These provisions apply even where the PBM is simply enforcing plan terms chosen by the plan sponsor.  If, for example, a plan sponsor chooses to limit coverage of nonaffiliated pharmacies by requiring or financially inducing plan participants to use affiliated pharmacies or granting those pharmacies preferred status, a PBM cannot enforce those plan terms.

71.    In another provision, Health & Safety Code § 1385.0028 provides that PBMs cannot prohibit nonaffiliated pharmacies from offering ancillary delivery services through mail or personal delivery.  As a result, if a plan's terms exclude coverage of mail or personal delivery from nonaffiliated pharmacies, a PBM cannot administer those terms.  Plans will thus lose a key tool to incentivize members to use mail or ancillary delivery services by affiliated pharmacies with lower rates.

72.    Subsequent provisions, Health & Safety Code §§ 1385.0029(e)-(f), also prohibit PBMs from making any reduction of payments paid to a pharmacy "under a reconciliation process" or for any reason other than (1) if the claim was submitted fraudulently, (2) if the original payment on the claim

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

Gibson, Dunn &
Crutcher LLP

was incorrect because the pharmacy had already been paid, or (3) if the services were not properly rendered. Where the plan provides for coverage subject to reconciliation, therefore, a PBM cannot enforce the plan's terms.

73.    All of the above provisions severely limit the options of PBMs—and therefore their insured plan clients—in establishing pharmacy networks that are critical to plan design. As with SB 41's restrictions on formulary design, plans can avoid these restrictions only by cutting PBMs out of the process. SB 41's network affiliation provisions thus further force plan sponsors to either expand their network coverage or alter their decision about who will administer the plan.

### C.    SB 41 Restricts How Plans Can Compensate PBMs

74.    Several provisions of SB 41 restrict the methods by which plans (and their insurers/administrators) compensate PBMs for their services. Rather than allowing plans and their insurers/administrators to select various methods that most align with the plan sponsors' goals, SB 41 is intended to limit PBM compensation to a single method. The statute accomplishes this goal both by mandating that method expressly and by prohibiting certain common alternative means of compensating PBMs.

75.    The permitted method is laid out in Health & Safety Code § 1385.0029(a), which provides that a PBM "shall not derive income from pharmacy benefit management services provided to a payer in this state except for" a single type of income: "income derived from a pharmacy benefit management fee for pharmacy benefit management services provided." A pharmacy benefit fee, in turn, is defined as "flat, defined, dollar-amount fee" that does not exceed the "bona fide value" of the services. Health & Saf. Code § 1385.001(s). The result is that, for fully insured plans, PBM compensation is limited to a flat fee based on the value that PBM services provide to the insurer.

76.    The definition of "pharmacy benefit management fee," in turn, forbids several commonly used methods of compensating PBMs. A pharmacy benefit management fee cannot be tied

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

Gibson, Dunn & Crutcher LLP

to: (1) the price that a plan pays for prescription drugs, Health & Saf. Code § 1385.001(s)(1); (2) the amount of savings or rebates collected by the PBM or its affiliates, *id.* § 1385.001(s)(2); (3) the amount of premiums or other cost sharing or fees charged, realized, collected by, or generated based on the activity the PBM performs on behalf of patients, *id.* § 1385.001(s)(3); (4) coverage or formulary placement decisions or the value of any referrals generated between the parties to the arrangement, *id.* § 1385.001(s)(4); or (5) other methodologies defined by DMHC, *id.* § 1385.001(s)(5).  In other words, plans cannot base PBM compensation on the reduction in prices a PBM secures, regardless of whether those savings are retained by the PBM or passed through to plans; the amounts charged from or collected on behalf of clients; formulary decisions based on the contracts negotiated by the PBM; or not yet defined methodologies.

77.    Other provisions also specifically prohibit spread pricing, Health & Saf. Code §§ 1385.001(w), .0029(b), .0031; Ins. Code § 10123.2045(c)(2), and require PBMs to pass all manufacturer rebates through to their clients, Health & Saf. Code § 1385.0029(c).  The statute defines rebates broadly to include "compensation or remuneration of any kind received or recovered from a pharmaceutical manufacturer by a" PBM or affiliated entity regardless of how the compensation is categorized.  Health & Saf. Code § 1385.001(v).  The result is that: (1) the insurer must pay the PBM the same amount the PBM pays the pharmacy for a covered drug; (2) the PBM must pay that entire amount to the pharmacy dispensing the drug; and (3) plans may no longer elect to compensate PBMs by allowing them to retain a portion of the rebates the PBMs negotiate or fees from other services that the PBMs provide to manufacturers.

78.    Ultimately, SB 41 provides that plans and their insurers can compensate their PBMs only by paying them a flat fee, and this fee cannot be related to the price of prescription drugs, the amount of savings the PBM is able to negotiate on behalf of plans, the amount of savings the plan realizes through the PBM's actions, the formulary design, or as yet undefined methodologies to be

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

Gibson, Dunn & Crutcher LLP

determined by the DMHC.  Plans are also not permitted to use spread pricing, nor are they permitted to compensate PBMs by allowing them to keep a portion of rebates.

**GROUNDS FOR RELIEF**

79.    SB 41 purports to regulate PBMs.  But in doing so, it also effectively regulates the ERISA plans that rely on PBMs to manage prescription drug benefits.  The fully insured ERISA plans targeted by SB 41's formulary, pharmacy network, and compensation restrictions rely on PBMs to handle a range of functions that they and their insurers cannot perform in-house.  By regulating the services that PBMs can perform for plans, SB 41 effectively forces plans to either change the benefits they offer in California or switch insurers to entities exempt from SB 41's reach because they perform their own PBM services in-house.

80.    California's interference with health plans' and PBMs' efforts to achieve cost savings and high-quality healthcare for beneficiaries will have severe negative effects not only on Plaintiffs, but also on thousands of Californians who have come to rely on the essential services that PBMs provide.  By substituting the judgment of California government officials for the judgments of plan sponsors on how best to manage benefits for their members, SB 41 threatens to substantially increase costs, reduce the services available to beneficiaries, radically increase wasteful expenditures on future litigation against plans and PBMs, and unnecessarily constrain plan determinations about how to provide the most effective care at the best price.

81.    Moreover, California is only one state in the Union.  If California's bespoke, state-level restrictions were permitted to proceed, it logically would mean that other states similarly are entitled to enact their own idiosyncratic regulations about how PBMs may structure benefits, design pharmacy networks, and obtain compensation for those services.  Such states of course would not be bound to adopt California's model, but could invent their own detailed codes about which pharmacies plans must use and the dollars-and-cents amounts that flow to PBMs from those services.  Blessing what one State

bills as experimentation is a blueprint for national balkanization—and thus the demise of the national uniformity ERISA was designed to ensure.

82. The resulting interference with plan administration will be severe. The average multi-state employer that sponsors a fully insured ERISA prescription-drug benefit for its employees, including employees in California, must decide (i) which drugs to cover and under what terms (its formulary), (ii) which pharmacies will be covered and whether any subset will be preferred (its pharmacy network), and (iii) whether to use a pharmacy benefit manager (PBM)—and if so, how to compensate that PBM for administering the drug benefit. These are core plan-design and plan-administration decisions that ERISA leaves to plan sponsors and fiduciaries.

83. Before SB 41, multi-state employers could select an insurer that contracts with a PBM to manage those pharmacy benefits. The PBM, in turn, could negotiate manufacturer rebates that multi-state employers could access by adopting particular formulary designs—sometimes including exclusive placement within a therapeutic class to secure better net pricing. Multi-state employers could also elect a pharmacy network that encourages members to use certain preferred pharmacies, including mail-order or specialty pharmacies, because those channels can be lower-cost and operationally reliable. And multi-state employers could choose a compensation model—such as a pass-through pricing arrangement combined with per-member fees, performance guarantees, or other structures—that those employers determine best aligns the PBM's incentives with the plan's cost, quality, and access goals.

84. SB 41 disrupts all three of these plan-administration choices at once. *First*, SB 41 limits the ability of the PBM, and therefore the multi-state employers that use the PBM, to use formulary exclusivity as negotiating leverage for rebates unless the PBM can satisfy California's mandated showing. That restriction reduces the range of formulary designs multi-state employers may adopt, even when those employers determine that exclusivity produces the best overall benefit design.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

Gibson, Dunn & Crutcher LLP

*Second*, SB 41 restricts the PBM from administering plan terms that prefer certain pharmacies over others, including through any-willing-provider and non-discrimination requirements that prevent multi-state employers from structuring a preferred pharmacy network to control costs and manage quality. *Third*, SB 41 constrains PBM compensation to a narrow flat-fee model and prohibits commonly used alternatives—such as spread pricing or rebate-retention structures—that plans may choose to align incentives and manage financial risk.

85.    The combined effect is that California substitutes its regulatory judgment for multi-state employers' fiduciary and sponsor decisions about how to structure and administer an ERISA plan's prescription-drug benefit.  Operationally, those employers can avoid these restrictions only by restructuring who performs PBM functions—such as moving to an insurer model that performs those functions in-house—or by redesigning its formulary, pharmacy network, and compensation approach specifically for California participants.  Either path requires multi-state employers to tailor plan administration to California's idiosyncratic rules.

86.    The U.S. Constitution does not tolerate this state-level interference with a market that Congress deliberately intended to be nationally uniform, and in which Congress sought to give plans wide latitude about how to structure and administer their affairs.  SB 41 is preempted under ERISA and thus is invalid under the Supremacy Clause.  ERISA's broad preemption clause invalidates state laws that, like SB 41, unduly interfere with plan administration and disrupt national uniformity through onerous, state-specific requirements.

**I.    ERISA Preempts Several Provisions Of SB 41 As Applied To ERISA Plans**

87.    To secure federal control over markets properly regulated at a national level, the Constitution's framers codified the Supremacy Clause, which renders federal law "supreme" over state-level enactments that conflict or interfere with federal prerogatives. U.S. Const. Art. VI, cl. 2. ERISA, in turn, leveraged the Supremacy Clause to provide for broad federal preemption of local interference

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

Gibson, Dunn &
Crutcher LLP

with the administration of employee-benefit plans.  *See* 29 U.S.C. § 1144(a).  That established federal framework notwithstanding, SB 41 imposes several new and onerous requirements that would improperly regulate plan administration—defying ERISA's core directive that such regulation is exclusively a matter of federal concern.  Where, as here, such state interference is "pre-empted by a federal statute," it is "beyond dispute" that federal courts may "enjoin state officials" from enforcing those state laws.  *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983).

### A.     ERISA Broadly Preempts State Interference With The Administration Of Employee-Benefit Plans

88.    To ensure national uniformity in plan administration, ERISA's preemption clause expressly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."  29 U.S.C. § 1144(a).  That clause has a "broad scope," *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739 (1985), and "deliberately expansive" sweep, *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46 (1987).  "Congress's intent" in framing the provision was "to establish the regulation of employee welfare benefit plans 'as exclusively a federal concern'" by eliminating "a multiplicity of regulation" concerning benefit plans.  *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656-57 (1995).

89.    As the Ninth Circuit has explained, state laws "'relate' to an ERISA plan" when they "'have an "impermissible connection" with an ERISA plan,'" meaning that they "'gover[n] a central matter of plan administration or interfer[e] with nationally uniform plan administration.'"  *Bristol SL Holdings, Inc. v. Cigna Health & Life Ins. Co.*, 103 F.4th 597, 602, 604 (9th Cir. 2024); *accord Gobeille*, 577 U.S. at 323.  This case implicates both prohibitions.

90.    ***Central Matters of Plan Administration***.  A law affects "'a central matter of plan administration'" when it regulates any of the "fundamental components" of administering ERISA plans.  *Gobeille*, 577 U.S. at 323.  Thus, states may not "forc[e] plans to adopt any particular scheme of substantive coverage," *Rutledge*, 592 U.S. at 88, "hinde[r] … plans from structuring their benefits

Gibson, Dunn & Crutcher LLP

as they choose," *Mulready*, 78 F.4th at 1199, "mandat[e] the plan's structure" by "'prohibiting'" or "'limit[ing]'" plans to certain types of benefits providers, *Ky. Ass'n of Health Plans, Inc. v. Nichols*, 227 F.3d 352, 362 (6th Cir. 2000), or "'bin[d] plan administrators to [a] particular choice' about a plan's substantive benefits," *McKee Foods Corp. v. BFP Inc.*, ---F.4th---, 2026 WL 936759, at *10 (6th Cir. Apr. 7, 2026); *accord CIGNA Healthplan of La., Inc. v. State of La. ex rel. Ieyoub*, 82 F.3d 642, 648 (5th Cir. 1996). As a result, States may not regulate "a pharmacy network's scope" or "limi[t]" plans "'to using PBM networks of a certain structure'"—which implicates "key benefit designs for an ERISA plan." *Mulready*, 78 F.4th at 1198 (alterations adopted); *accord McKee Foods Corp.*, 2026 WL 936759, at *11 (laws regulating "the scope and extent of a plan's pharmacy network" are preempted).

91.     ***National Uniformity.***  States also are prohibited from subjecting plans to "variable treatment under state law," *Bristol SL Holdings, Inc.*, 103 F.4th at 605, or "requir[ing] the tailoring of plans and employer conduct to the peculiarities of … each jurisdiction," *Travelers*, 514 U.S. at 656-67 (citations omitted). Idiosyncratic requirements particular to individual states represent the very "type of discordant regime that 'ERISA's comprehensive pre-emption of state law was meant to minimize.'" *Bristol SL Holdings, Inc.*, 103 F.4th at 605 (quoting *Shaw*, 463 U.S. at 105 n.25). Indeed, as the Supreme Court has explained, "[u]niformity is impossible … if plans are subject to different legal obligations in different States." *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 148 (2001). "Such a patchwork of laws would require plans to 'maintain familiarity with the laws of all 50 States'" and "'update their plans as necessary'" to conform to local restrictions. *McKee Foods Corp.*, 2026 WL 936759, at *11.

92.     What States cannot do directly with respect to ERISA plans, they also may not do "'indirectly'" through artifice. *District of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125, 131 (1992) (citation omitted); *accord Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990) ("[A]

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

Gibson, Dunn &
Crutcher LLP

state law may 'relate to' a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect."). A consequence of that principle is that state laws nominally regulating PBMs or other third-party administrators (rather than plans as such) are nonetheless subject to ERISA preemption. "Because PBMs manage benefits on behalf of plans, a regulation of PBMs 'function[s] as a regulation of an ERISA plan itself.'" *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 966 (8th Cir. 2021); *Mulready*, 78 F.4th at 1196 (same); *Pharm. Care Mgmt. Ass'n v. Dist. of Columbia*, 613 F.3d 179, 188 (D.C. Cir. 2010) (same); *Gobeille*, 577 U.S. at 317 (same with third-party administrator).

**B.       SB 41's Restrictions On Formulary Design Are Preempted**

93.       Under these principles, ERISA preempts SB 41's "exclusivity" provision, which imposes new restrictions on how plans structure their formularies—a key aspect of plan design. *See* Health & Saf. Code § 1385.0032(a). As the Tenth Circuit has recognized, plan terms "include what drugs the plan covers (the formulary)." *Mulready*, 78 F.4th at 1188. Decisions about a plan's formulary thus constitute an integral part of "the plan's prescription-drug-benefit design or structure"—which itself is a central matter of plan administration. *Id.*

94.       Prohibiting PBMs from entering into contracts to exclusively use a manufacturer's drugs unless certain terms are met (like showing exclusivity would result in "the lowest cost sharing for the plan participant," Health & Saf. Code § 1385.0032(a)), would directly undermine plans' control over formulary design by restricting their options about which drugs they may offer and under what conditions. And it would also encroach on PBMs' negotiations with drug manufacturers on behalf of plans. PBMs, for example, may hold out the possibility of an exclusive contract as leverage in negotiations with drug manufacturers to secure price concessions—which are still beneficial to plans and beneficiaries regardless whether they result in the "lowest" possible price. But SB 41 would remove this key bargaining chip from those negotiations, thereby interfering with PBMs' efforts to

Gibson, Dunn & Crutcher LLP

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

help plans structure their formularies.

95.    SB 41's exclusivity provision also offends national uniformity.  Prohibiting exclusivity would mean that plans and PBMs could hold contracts with manufacturers valid in many other states but that would have to be renegotiated to comply with California's requirements.  Requiring plans to negotiate California-specific arrangements because SB 41 renders unlawful routine contracts that are valid across swaths of the rest of the United States would destroy the national uniformity ERISA is designed to protect.  Moreover, if *California* can dictate the terms on which plans and PBMs design and administer their formularies, then other states can, too.  And nothing guarantees that those states would settle on the precise restrictions that California here has deemed appropriate—a recipe for a series of divergent and potentially conflicting restrictions that would massively increase the burden of administering benefit plans throughout the country.  That patchwork would directly undermine ERISA's core premise that employers should be encouraged to offer benefit plans through the creation of "'a uniform administrative scheme[ providing] a set of standard procedures to guide processing of claims and disbursement of benefits.'"  *Egelhoff*, 532 U.S. at 148.

96.    Plans can avoid these restrictions and preserve the national uniformity of their formularies only by abandoning the use of a PBM and choosing an insurer that performs its own PBM functions in-house.  In other words, plans must either change their basic design and coverage (their formularies) or change who administers them.

97.    The typical small California employer that offers a fully insured ERISA health plan to its employees, for example, lacks the scale, bargaining power, or internal infrastructure to design and administer a prescription-drug benefit on its own.  Many such employers rely on an insurer that, in turn, contracts with an independent PBM to manage formularies, pharmacy networks, and claims administration.  Before SB 41, those employers could offer their employees a prescription-drug benefit that reflected nationally available plan designs, including preferred pharmacy networks,

Gibson, Dunn &
Crutcher LLP

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

rebate-supported formularies, and compensation arrangements that helped control costs and stabilize premiums.

98.     Yet after SB 41, those employers are forced into a choice Congress did not authorize. Because SB 41 applies to fully insured plans that rely on independent PBMs—but exempts insurers that perform PBM functions in-house—employers must either accept SB 41's restrictions on formulary design or abandon their existing plan structure and move to a different insurer that performs PBM services internally, if such an option is even available.  In effect, SB 41 conditions the availability of common, nationally used plan designs on employers' willingness to restructure who administers their ERISA plan or to accept state-mandated limits on plan administration.  That coercive structure does not merely increase costs or alter incentives; it dictates how ERISA plans may be designed and administered in California, and does so in a way that fragments nationally uniform plan administration along state lines.

99.     This type of "Catch-22" only strengthens the case for preemption. *Bristol SL Holdings*, 103 F.4th at 605.  As the Ninth Circuit recognized in *Bristol*, a state law is preempted if it requires plans to choose between two forms of regulation that are themselves preempted.  *Id*.  Here, ERISA prevents California from *either* forcing plans to change their formularies or forcing them to change their insurer and cease using a PBM.  Because SB 41 makes plans choose between these preempted options, it is preempted.

**C.     SB 41's Restrictions On Pharmacy Network Design Are Preempted**

100.     SB 41 would also severely intrude on how plans design and structure their pharmacy networks (*i.e.*, the pharmacies they rely on to provide prescription-drug benefits).  Plans (through PBMs) often seek lower costs and higher-quality service by preferencing pharmacies affiliated with PBMs like Optum Rx.  PBM-affiliated pharmacies are often more efficient because they can use economies of scale to provide lower-cost drugs and services.  And PBM-affiliated pharmacies are often

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

Gibson, Dunn &
Crutcher LLP

subject to stringent quality-control measures that ensure high-quality service to members. This quality assurance increases member satisfaction and medication adherence, which in turn lowers costs for plans to cover medical coverage for those members.

101. SB 41, by contrast, would render these common and beneficial arrangements unlawful with a raft of new restrictions prohibiting PBMs from taking a pharmacy's nonaffiliate status into account when structuring contracts and networks. *See* Health & Saf. Code § 1385.0026(a) (prohibiting "discriminat[ion]" against nonaffiliated pharmacies); *id*. §§ 1385.0026(b) (prohibiting PBMs from taking nonaffiliate status into account in contracts and reimbursement decisions), 1385.0027(a)-(f) (any willing provider provisions); *id.* §§ 1385.0028 (restriction on prohibition of mail-order delivery by nonaffiliates), 1385.0029(e)-(f) (claims processing restrictions). The upshot of these provisions is that even when a PBM has determined that it is economically beneficial for plans to prefer affiliated pharmacies, SB 41 nonetheless prevents PBMs from structuring plan benefits in that manner and harnessing the resulting synergies and improvements in quality of service.

102. Start with Health & Safety Code §§ 1385.0026(a) and 1385.0026(b). These provisions would prohibit PBMs from imposing "any requirements, conditions, or exclusions that discriminate against a nonaffiliated pharmacy in connection with dispensing drugs," § 1385.0026(a), and would prohibit PBMs from taking into account nonaffiliated pharmacies' "status" as nonaffiliates in any "[t]erms or conditions in contracts," in decisions whether to contract, and in reimbursement decisions where the nonaffiliate would be reimbursed less for the same service than an affiliate, *id*. § 1385.0026(b). While nominally framed as measures to ensure equal treatment for nonaffiliated pharmacies, these provisions in reality would severely constrain how plans and PBMs design their pharmacy networks.

103. As explained above, *see supra* §§ 38-44, there are numerous valid reasons that PBMs and plans choose to prefer affiliates, ranging from cost-savings and economies of scale to speed and

Gibson, Dunn & Crutcher LLP

quality control.  Yet SB 41 would prohibit preferences in favor of affiliated pharmacies when plans and PBMs structure their pharmacy networks.  That overreach strikes at a "cornerston[e] in plans' prescription-drug benefit structures," *i.e.*, "prescription-drug benefit design."  *Mulready*, 78 F.4th at 1201.  Indeed, these provisions "home in on PBM pharmacy networks—the structures through which plan beneficiaries access their drug benefits," and therefore "impede PBMs from offering plans some of the most fundamental network designs, such as preferred pharmacies."  *Id.* at 1200.  These provisions represent "an impermissible dictate seeking to control how a plan is designed and structured," *McKee Foods Corp.*, 2026 WL 936759, at *14, and thus squarely interfere with a central matter of plan administration.

104.    SB 41's any-willing-provider provision, Health & Saf. Code § 1385.0027(f), further constrains PBMs' design of pharmacy-network structures.  That provision prohibits PBMs from denying "a nonaffiliated contract pharmacy the opportunity to participate in a [PBM] network as preferred participation status if the pharmacy is willing to accept the same terms and conditions that the [PBM] has established for affiliated pharmacies as a condition of preferred network participation status."  Health & Saf. Code § 1385.0027(f).  In other words, SB 41 requires PBMs to include nonaffiliated pharmacies in the networks that cover plan members on the same terms as affiliated pharmacies, even if a plan's judgment is that incorporating those pharmacies is not the best method to deliver cost-effective and quality care.  This provision directly interferes with pharmacy network design by "'eliminat[ing] the choice of one method of structuring benefits,'" *i.e.*, to give preferred participation status only to affiliated pharmacies in the network.  *Mulready*, 78 F.4th at 1197 (quoting *CIGNA Healthplan of La., Inc.*, 82 F.3d at 648); *accord McKee Foods Corp.*, 2026 WL 936759, at *14 (ERISA preempts both "'requiring'" and "'forbidding'" benefits structures).

105.    Unsurprisingly, courts often have deemed any-willing-provider provisions to impermissibly intrude upon pharmacy-network design, resulting in preemption under ERISA.  In

32

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

Gibson, Dunn & Crutcher LLP

*Mulready*, for example, the Tenth Circuit determined that a substantively identical Oklahoma law—which would "requir[e] PBMs to admit every pharmacy that is willing to accept the PBM's preferred-network terms into that preferred network"—was "impermissibly connected with ERISA plans." 78 F.4th at 1196-97. The Fifth Circuit reached the same conclusion as to a Louisiana law prohibiting "'deni[al of] the right to become a preferred provider'" when the provider "'agrees to the terms and conditions of the preferred provider contract.'" *CIGNA Healthplan of La., Inc.*, 82 F.3d at 645. The Sixth Circuit held likewise as to a Kentucky law prohibiting "'discriminat[ion] against any provider who … is willing to meet the terms and conditions for participation established by the health benefit plan,'" *Nichols*, 227 F.3d at 355, and just recently re-confirmed that because "AWP provisions mandate a specific benefit structure," they must fall to ERISA preemption, *McKee Foods Corp.*, 2026 WL 936759, at *12. The upshot of these cases is clear: States may not "direc[t] or forbi[d] an element of plan structure or benefit design." *Mulready*, 78 F.4th at 1198. Here, Health & Safety Code § 1385.0027(f) runs directly contrary to those principles and thus must "succumb to ERISA preemption." *Id.*

106. Health & Safety Code § 1385.0028(a) further intrudes on benefits design by impermissibly regulating how PBMs contract with nonaffiliated pharmacies to deliver prescription drugs. Under that provision PBMs may not contract with nonaffiliated pharmacies to prohibit those pharmacies from delivering "a prescription drug by mail or common carrier" to patients. Health & Saf. Code § 1385.0028(a)(1)-(2). Put differently, PBMs must permit nonaffiliated pharmacies to fill prescription drugs "by mail or common carrier," even if the plan elects not to cover nonaffiliated mail-order pharmacy services, and even if those services are not, in the plan's judgment, the most reliable and cost-effective method of delivering prescriptions. *Id.* The choices of whether to "use mail-order pharmacies," however, and if so, "which pharmacies" can be used to "have prescriptions filled," are core aspects of a "plan's prescription-drug-benefit design or structure" because those choices affect the

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

Gibson, Dunn &
Crutcher LLP

cost of prescription drug benefits and the quality of service to plan members. *Mulready*, 78 F.4th at 1188, 1199; *accord McKee Foods Corp.*, 2026 WL 936759, at *14 (states may not interfere with "a plan's ability to design its network in a way most accommodating and beneficial to its participants"). Because that "winnow[ing]" of options hinders "plans from structuring their benefits as they choose," ERISA places off limits individual states' attempts to dictate which pharmacy services PBMs may or may not contract to offer. *Mulready*, 78 F.4th at 1199.

107. SB 41 also specifically intrudes on another core aspect of plan administration—the "'processing of claims.'" *Egelhoff*, 532 U.S. at 148. Health and Safety Code § 1385.0029(f) provides that "[a] claim or aggregate of claims for pharmacist services shall not be directly or indirectly retroactively denied or reduced after adjudication of the claim or aggregate of claims" outside of three narrowly drawn circumstances (fraud, a claim that is "incorrect" because it was already paid, and where the "pharmacist services were not properly rendered"). Similarly, Health and Safety Code § 1385.0029(e) provides that PBMs may not "make or permit any reduction of payment for pharmacist services" under their "reconciliation process to an effective rate of reimbursement." PBMs often use retroactive recoupment to enforce standards relating to quality of care—for example, requirements to timely fill prescriptions or to minimize errors. These provisions directly regulate the claims-processing activities that ERISA was designed to shield from federal interference. "By what means an ERISA Plan administrator determines whether a claim is covered *and to what extent* is closely intertwined with how benefits are paid for that claim," meaning that attempts to impose additional regulations on claims processing "are … preempted." *Cal. Brain Inst. v. United Healthcare Servs., Inc.*, 2024 WL 2190983, at *4 (C.D. Cal. May 15, 2024) (emphasis added) (citing *Egelhoff*, 532 U.S. at 150).

108. Indeed, the Ninth Circuit recently deemed state-law claims seeking to achieve the same effect as Health and Safety Code §§ 1385.0029(f) and 1385.0029(e) preempted in *Bristol SL Holdings*, 103 F.4th at 604. The claimants there sought to bind plan administrators to their initial representations

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

Gibson, Dunn & Crutcher LLP

about coverage and thus to prohibit the "deni[al of] reimbursement" after fully adjudicating the claim. *Id.* The Court recognized that preventing those denials "would be at odds with the way ERISA plans operate"—and thus was preempted—"because reimbursement under a plan is ultimately contingent on information and events beyond the initial verification." *Id.* So too here; the appropriate rate of reimbursement is contingent on later determinations made in PBMs' reconciliation and adjudication processes. Thus, Health and Safety Code §§ 1385.0028(f) and 1385.0029(e), just like the state-law claims in *Bristol SL Holdings*, interfere with central matters of plan administration.

109. These severe restrictions on pharmacy network design also impede nationally uniform plan design. Numerous states do not prohibit PBMs from taking pharmacies' nonaffiliated status into account when structuring their pharmacy networks, drafting related contracts, and processing claims. Employers can thus rely on a pharmacy network based on affiliated pharmacies throughout the rest of the country that those employers have determined can provide cost-effective and reliable services. Yet SB 41 would render that structure invalid in California, disrupting the provision of services and requiring the construction of a special, good-for-California-only pharmacy network compliant with SB 41's extensive state-level restrictions. This interference undermines ERISA's "promise of uniformity," which "is vitally important for employers," who are supposed to "'have large leeway to design … plans as they see fit.'" *Mulready*, 78 F.4th at 1193.

110. Finally, just like with formulary design, the carve-out of insurers who perform PBM functions in-house from SB 41's restrictions on network design only strengthens the case for preemption. Plans can preserve their network restrictions only if they change insurers and stop using PBMs. Since ERISA bars the state from imposing either option, SB 41 is preempted.

### D.   SB 41's Restrictions On PBM Compensation Are Preempted

111. SB 41 also would greatly restrict how plans may compensate PBMs for the vital services they provide through a gamut of new directives. *See* Health & Saf. Code § 1385.0029(a) (limiting

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

Gibson, Dunn & Crutcher LLP

PBM compensation to a "PBM fee"); *id*. § 1385.001(s) (prohibiting PBMs' retention of, *inter alia*, rebates, savings, and price concessions on drugs); *id*. § 1385.0029(b) (mandating passthrough pricing); *id*. §§ 1385.0029(c) (requiring that 100% of rebates be passed through to PBM clients), 1385.0031 (prohibiting spread pricing); Ins. Code § 10123.2045(c)(2) (same).

112.    How plans choose to compensate PBMs is inextricably linked to basic aspects of plan design.  That is because how PBMs are compensated affects the services that plans may offer and the scope and price of benefits provided to beneficiaries.  For example, permitting PBMs to retain a portion of the savings those PBMs generate through negotiations with manufacturers creates a critical economic incentive for PBMs to reach the best bargain for the plan, thereby reducing drug prices for beneficiaries.  PBMs' ability to generate those savings can also affect the allocation of costs as between plans and members.  If PBMs secure drugs at cheaper prices, for example, it creates the opportunity for plans to reduce beneficiaries' premiums, co-pays, or deductibles.  Not so, however, if a critical incentive to secure those savings is removed.

113.    PBM compensation practices also can create much-needed certainty about drug prices for plans.  Take the example of spread pricing—the practice whereby PBMs are reimbursed by plans at a fixed rate and may keep the "spread" generated by securing drugs at a price lower than that fixed rate.  Spread pricing is not always profitable (in some cases, for example, the PBM's payment to a pharmacy or manufacturer can exceed the plan's reimbursement to the PBM, causing it to lose money on certain transactions), and not all PBMs engage in the practice.  But some do, as plans desire the price stability associated with the fixed rate, which shields plans from fluctuating drug prices they otherwise would have to account for when pricing out benefits.  Many plan administrators therefore elect to pay PBMs a premium—the spread—because they find the associated stability of a fixed rate beneficial for plan administration.  Yet SB 41 would render these typical PBM compensation practices unlawful and thereby impede the economic incentives that largely drive PBMs' cost-saving

Gibson, Dunn &
Crutcher LLP

36

negotiations.

114.   Courts have had no trouble deeming such provisions preempted under ERISA.  In *PCMA v. District of Columbia*, for example, the D.C. Circuit held that materially similar "pass back" provisions that required PBMs to pass back "'any payment or benefit of any kind'" received from drug manufacturers intruded upon "'a central matter of plan administration.'"  613 F.3d at 183, 186.  In other words, the provisions affected "the administration of employee benefits by requiring a PBM to follow a specific practice in administering pharmaceutical benefits on behalf of [plans]." *Id.* at 185.  The D.C. Circuit held that those provisions were saved from preemption *only* because the law at issue "expressly provide[d]" that plans and PBMs could "agre[e] by contract" to permit PBMs to keep "a portion of the benefit or payment." *Id.* at 186.  Here, by contrast, SB 41 contains no analogous opt-out provision— and thus no way for PBMs to avoid the law's interference with plan administration.  SB 41's similar provisions are thus squarely preempted under ERISA for their intrusion upon central matters of plan administration.

115.   ERISA's mandate of national uniformity points in the same direction.  Before SB 41, multi-state employers enjoyed discretion about the terms on which they chose to compensate a PBM for its services—and thus could agree to compensation models that they determined would facilitate efficiency and create important incentives for their PBMs to secure the best price on pharmaceutical benefits.  But after SB 41, employers' exercise of that judgment is now unlawful in California.  Rather than continuing to utilize arrangements that remain beneficial and valid outside the state, the company instead would be forced to modify the terms on which it compensates its PBM specifically for California services.  Further, other states could impose conflicting, alternative compensation schemes, requiring different formularies for PBMs that serve multi-state employers in every state those employers operate.  ERISA was designed to prevent such a disuniform system, where the legality of plan administration practices stops and starts with state borders.

Gibson, Dunn & Crutcher LLP

37
COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

**CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF**

**COUNT I**

**(ERISA Preemption)**

**(against all Defendants)**

116.    Plaintiffs incorporate the above allegations by reference.

117.    Sections 1385.001, .0026-.0029, .0031 of the California Health & Safety Code and Section 10123.2045 of the California Insurance Code are preempted by ERISA's express preemption clause, which provides that ERISA "shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan" covered by the statute.  29 U.S.C § 1144(a).

118.    ERISA expressly preempts state laws that impermissibly relate to ERISA plans and that interfere with national uniformity in plan administration or that regulate matters central to plan administration.   Health & Safety Code §§ 1385.001, .0026-.0029, .0031, and Insurance Code § 10123.2045, run afoul of those bedrock principles.   These provisions have an impermissible "connection with" ERISA plans in that they intrude upon an area that ERISA comprehensively occupies, and prohibit plan sponsors from structuring their employee benefit plans in a particular manner.

119.    As a result, Health & Safety Code §§ 1385.001, .0026-.0029, .0031, and Insurance Code § 10123.2045, are preempted by ERISA, 29 U.S.C. § 1144, and thus are invalid under the Supremacy Clause, U.S. Const. art. VI cl. 2.

Gibson, Dunn &
Crutcher LLP

38

**PRAYER FOR RELIEF**

Plaintiffs pray that this Court:

1.  Declare that Sections 1385.001, .0026-.0029, .0031 of the California Health & Safety Code and Section 10123.2045 of the California Insurance Code of SB 41 are preempted under ERISA;

2.  Issue a permanent injunction prohibiting Defendants from implementing, administering, acting upon, or enforcing Sections 1385.001, .0026-.0029, .0031 of the California Health & Safety Code and Section 10123.2045 of the California Insurance Code against Plaintiffs;

3.  Award Plaintiffs costs and reasonable attorneys' fees as appropriate; and

4.  Grant Plaintiffs such further and other relief as this Court deems just and proper.

Gibson, Dunn & Crutcher LLP

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.

DATED:  May 8, 2026

Respectfully submitted,

**GIBSON, DUNN & CRUTCHER LLP**

By: */s/Kahn A. Scolnick*
KAHN A. SCOLNICK
333 S. Grand Ave.
Los Angeles, CA  90071-3197
Telephone:     213.229.7000
Facsimile:     213.229.7520
KScolnick@gibsondunn.com

*Attorney for Plaintiffs*

Gibson, Dunn &
Crutcher LLP

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Case No.